# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | **Crim. No. 10-29** |
| | : | |
| KENNETH SCHNEIDER | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY

The United States of America, by and through Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Michelle Morgan-Kelly and Vineet Gauri, Assistant United States Attorneys for the District, hereby responds to defendant's motion *in limine* to exclude expert testimony. Because the government's expert meets all of the requirements of Federal Rule of Criminal Procedure 16, Federal Rule of Evidence 702, and Daubert, the government respectfully requests that defendant's motion be denied.

## I.     THE GOVERNMENT HAS COMPLIED WITH RULE 16.

Federal Rule of Criminal Procedure 16(a)(1)(G) states that the government must provide "a written summary of any testimony that the government intends to use under Rule [] 702 . . . of the Federal Rules of Evidence during its case-in-chief at trial." The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."

The government's July 23, 2010 summary of Dr. Edelman's testimony and her curriculum vitae, attached to defendant's motion as Exhibit B, comply with Rule 16's requirements. Indeed, the summary includes bases for Dr. Edelman's testimony. For instance,

Dr. Edelman is expected to testify that victims of child sexual abuse often disclose this abuse on a delayed basis. The summary then provides several bases for this conclusion: shame, fear of retribution, attachment to abuser, etc. See Exhibit B at 1. Similarly, the summary provides bases for Dr. Edelman's testimony on other topics, such as grooming, victims' positive feelings towards their abusers, and victims' compensatory strategies for coping with abuse.

Notably, Dr. Edelman earned her doctorate in clinical psychology. Thus, unlike a doctor of philosophy (such as newly-revealed defense expert Dr. Thomas Haworth, Ph.D.), her experience is in the clinical setting, not the academic setting. Rather than postulating in the classroom and compiling data in order to achieve tenure, she has spent numerous years treating actual patients who have had the experience of childhood sexual abuse, about which she now opines. There is no requirement under Rule 16 that an expert's stated bases must include specific mentions to publications or studies. Fortune Dynamics, Inc. v. Victoria's Secret Stores Brand Management, Inc., No. 08-56291, 2010 WL 3258703, *16 (9th Cir. Aug. 19, 2010) (individual with 40 years of experience in marketing and advertising could testify as expert on placing words on product, based on his experience in the industry); United States v. Lopez, 547 F.3d 364, 373 (2d Cir. 2008) (investigator properly qualified as expert on drug paraphernalia based on what he had observed his 17 years' experience investigating narcotics cases).

The defendant argues that the purported non-disclosure of Dr. Edelman's bases "has hampered the defense in its trial preparation – both in terms of preparing cross-examination of [Dr. Edelman] and of finding its own expert witness to provide contrary testimony." The Court's original scheduling order reflects that expert disclosures in this case were due on July 23, 2010, with which the government complied. In light of the subsequent trial continuance, this

gave defendant more than seven weeks to prepare his cross-examination, and the instant motion. When a defendant lies in wait for seven weeks until complaining – eight days before trial – about an expert summary, his claim that his trial preparation has been hampered rings hollow.

Moreover, his complaint is belied by the fact that he has now submitted an expert summary of over six single-spaced pages for his own psychological expert, Dr. Thomas Haworth (attached as Exhibit C). In fact, Dr. Haworth even helpfully provides the defendant with references to studies on grooming and delayed disclosure which support Dr. Edelman's widely-held views on these topics. Accordingly, the government's summary meets the requirements of Rule 16, and the defendant's cries of prejudice should be dismissed.

## II. THE GOVERNMENT EXPERT TESTIMONY SATISFIES THE REQUIREMENTS OF RULE 702 AND *DAUBERT*

Where specialized knowledge will assist the trier of fact to understand a factual issue, Federal Rule of Evidence 702 permits a person qualified as an expert "by knowledge, skill, experience, training, or education" to testify where her testimony (1) is based upon sufficient facts, (2) is the product of reliable principles, and (3) the expert has applied the principles reliably to the facts of the case. Fed. R. Evid. 702 (emphasis added).

### A. Qualifications

To testify as an expert, a witness must have "specialized knowledge" regarding the area of testimony. Elock v. K-Mart Corp., 233 F.3d. 734, 741 (3d Cir. 2000). Such knowledge may be based on "practical experience as well as academic training and credentials." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). The minimum admissibility requirement is the expert witness must "possess skill or knowledge greater than the average layman." Waldorf,

142 F.3d at 625.

"This liberal policy of admissibility extends to the substantive as well as the formal education of experts." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Id.

As the Eighth Circuit has explained, Rule 702 "does not rank academic training over demonstrated practical experience." Circle J Dairy Inc. v. A.O. Smith Harvestore Products, Inc., 790 F.2d 694, 700 (8th Cir. 1986). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997); see also United States v. 14.38 Acres of Land, 80 F.3d 1074, 1078 (5th Cir. 1996) ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system"); Rule 702, advisory committee note to 2000 amendments ("A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.").

Here, Dr. Edelman's qualifications certainly meet these liberal admissibility standards. She possesses a Master's degree in Group Psychotherapy, a Master's degree in Clinical Psychology, and a Doctorate in Clinical Psychology. Her clinical experience includes one year at the National Hospital for Kids in Crisis, the patient population of which included a large percentage of children who were severely sexually abused; four years at the Center for Children's Support, where she provided individual, family, and group psychotherapy to sexual abuse victims of all ages; and her own independent psychotherapy practice for the past eight

years, which has included patients who were victims of child sexual abuse.  In addition, she has

been a member of the Adjunct Faculty, Masters of Clinical and Health Psychology Program at

the Philadelphia College of Osteopathic Medicine since 2007.  Further, her clinical internships at

Eugenia Hospital and Einstein Hospital included patients with a comorbidity of prior sexual

abuse.  Thus, Dr. Edelman is amply qualified.

The assertion of defendant's expert that Dr.Edelman is not a Licensed

Professional Counselor ("LPC") who can perform evaluation and diagnosis is of no import in this

case.  Dr. Edelman was asked neither to evaluate nor to diagnose anyone.  Rather, her testimony

is sought to assist the jury in understanding the behavior of the victim in this case, including his

delayed disclosure and the impact of defendant's grooming conduct upon the victim.

**B.**     **Reliability**

The defendant's own expert report, authored by Dr. Haworth, establishes the

reliability of Dr. Edelman's testimony.  For example, Dr. Haworth's report confirms Dr.

Edelman's anticipated testimony on delayed disclosure; he states that "[i]t is not unusual for

child victims of sexual abuse to not tell parents or other adults that they are being a victim of

sexual abuse."  Exhibit C at 5.  Similarly, entirely consistent with Dr. Edelman, Dr. Haworth

discusses grooming as "a process engaged in by a perpetrator of child sexual abuse to build a

bridge of trust and connection to the minor child that will permit for sexual access," and that "the

purpose of grooming is to aid a perpetrator to gain trust and access to a child in order to facilitate

the victimization."  Id.  Just as Dr. Edelman does, Dr. Haworth describes the various methods

that perpetrators use to control their victims, which are nearly identical to those listed by Dr.

Edelman.  Dr. Haworth's consistent and cited opinions demonstrate inherently that Dr.

Edelman's points have been generally accepted in the scientific community and subject to peer review and publication.  See Kumho Tire v. Carmichael, 526 U.S. 137 (1999) (citing specific factors to be used by courts in considering expert reliability).  It is curious that defendant finds these opinions reliable when voiced by his own expert, but not by the government's expert.

### C.   Fit

The defendant argues that Dr. Edelman's testimony cannot assist the trier of fact. To the contrary, it is unlikely that many jurors – if any, after jury selection is completed – will have an understanding of the psychology of child victims of sexual abuse.  The defendant does not believe Dr. Edelman's testimony "fits" in this case only because her testimony does not fit the defendant's view of the facts.[1]  Contrary to defendant's assertion, the government's expert will not be offered to prove the victim is telling the truth - - indeed, she has not met the victim and has not evaluated him, nor could she opine on an ultimate issue of fact in the case - - but to explain the victim's conduct to the jury, which might otherwise strike them as confusing without Dr. Edelman's specialized knowledge to assist them.

### III.   DR. EDELMAN'S TESTIMONY IS MORE PROBATIVE THAN PREJUDICIAL.

The defendant next contends that Dr. Edelman's testimony has probative value that is "minimal at best," and carries "enormous danger of unfair prejudice and confusion." Memorandum at 17. The defendant apparently believes that the psychology of a child victim of

---

[1] The defendant argues that "[t]he fact that some unknown percentage of actual victims of sexual abuse may long delay reporting the event does not make it more or less likely that this particular witness is telling the truth in this particular case."  Memorandum at 16 (emphasis added).  Yet this is not an "unknown percentage;" defendant's own expert, Dr. Haworth, notes that "[s]tudies have reported between 30 and 80% of children purposefully do not disclose sexual abuse."   Exhibit C at 5.

sexual abuse is not beyond the ken of the average juror. As the government notes above, it is

unlikely that many – if any – jurors will have such an understanding, which is precisely why Dr.

Edelman's testimony is so probative. For example, Dr. Edelman is expected to testify that many

children who are sexually abused become sexually aroused during the abuse, and that victims of

childhood sexual abuse often have strong feelings of love and affection toward their abusers.

These are unlikely facts about which the average juror otherwise would be aware.

       Contrary to defendant's assertion, while the government stated in its expert

summary that Dr. Edelman was a child victim of sexual abuse, the government has never stated

any intention to elicit that fact during her testimony. Rather, this fact was merely disclosed to the

defendant to permit him to cross-examine Dr. Edelman on that basis if he wished to do so.

Because the defendant cannot point to any other prejudice or confusion caused by Dr. Edelman's

testimony, the defendant's Rule 403 argument also fails.

## VI.    USE OF THE TERM "EXPERT" IS APPROPRIATE.

       Finally, the defendant argues that, if Dr. Edelman's testimony is admitted, that neither the

Court nor the government should refer to her as an "expert" in the jury's presence. Yet Dr.

Edelman will merely "educate the factfinder about general principles, without ever attempting to

apply these principles to the specific facts of the case." Rule 702, advisory committee note to

2000 amendments. Thus, the government does not seek to elevate Dr. Edelman to "superjuror"

status and direct any verdict against the defendant. Dr. Edelman will merely provide the jury

with an understanding of grooming, delayed disclosure, and other key issues in sexual abuse of

children.

       In sum, under the applicable preponderance of evidence standard, the

government's expert summary meets the requirements of Rule 702 and <u>Daubert</u>.

## V.     CONCLUSION

For the reasons set forth above, the government respectfully requests that

defendant's motion in limine to exclude expert testimony be denied.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_____/s/_____
MICHELLE MORGAN-KELLY
VINEET GAURI
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I certify that on this day I caused a copy of the Government's response to defendant's

motion to exclude expert opinion testimony, to be served by electronic filing, and/or

first-class mail, addressed to:


JOSEPH P. GREEN
DUFFY & GREEN
138 WEST GAY STREET
WEST CHESTER, PA 19380


_____/s/_____
MICHELLE MORGAN-KELLY
Assistant United States Attorney


Dated: September 17, 2010

# EXHIBIT C

**Thomas F. Haworth, Ph.D.**
Licensed Clinical Psychologist
100 South Broad Street ● 17th Floor ● Philadelphia, PA 19110-1088
p: 609-970-3345  f: 215-701-1575  e-mail: thaworth@jjp.org

September 8, 2010

Mr. Joseph J. Green, Jr.
Attorney at Law
Duffy & Green, Chester County lawyers
138 West Gay Street
West Chester, PA. 19380

      RE:   United States v. Kenneth Schnieder

Dear Mr. Green:

      I am writing to discuss a number of issues that you requested I address to assist in your defense of Mr. Schneider in the current matter.

      As you can see from my curriculum vitae, in addition to 28 years of clinical experience working with adults, adolescents and children in a variety of inpatient, residential, and outpatient behavioral health settings, I hold a Ph.D. from Bryn Mawr College in Clinical Developmental Psychology. This doctoral program is a combined course of training to build expertise in both Clinical Psychology and Developmental / Child Psychology. During the program I received certification in Pennsylvania as a Certified School Psychologist (1994). It was during my training at Bryn Mawr that I became interested in sexual abuse as the result of my research activities and the work of one of my professors, Dr. Sharon Lamb. Upon completion of my coursework and requisite proficiency exams I did a pre-doctoral internship at University of Medicine and Dentistry of New Jersey, School of Osteopathic Medicine, Center for Children's Support over a two year period. This is a nationally recognized, SAMHSA awarded program for the evaluation and treatment of child sexual abuse in New Jersey. I was also involved with research and prevention training at the Center, and completed a Doctoral Dissertation entitled: Adolescents at risk for sexual violence, Who is "at risk" to be perpetrator or victim. After the Ph.D. was conferred, I continued to explore my interest in sexual violence and pursued post doctoral training and professional experience at The Joseph J. Peters Institute (JJPI) working with youth with sexual behavior problems and adult and adolescent sexual offenders. JJPI is a nationally recognized center for the evaluation, treatment, research, and prevention of sexual violence, which provides services to survivors of as well as perpetrators of sexual abuse. After completing the post doctoral year, and being licensed as a Psychologist in Pennsylvania, I was appointed as Director of Child & Adolescent Services, initially with responsibilities for services to child survivors of sexual abuse and their families and then within the year overseeing services to both child survivors, children with sexual behavior problems, and

juvenile sexual offenders. Additionally, I continued to function as a staff psychologist involved with evaluation and treatment of sexual offenders.

As part of my duties at JJPI, I supervise and train doctoral graduate students in psychology, MSW students, and undergraduates who come to the Institute to train in the evaluation and treatment of sexual abuse. In my tenure at JJPI, I have overseen the training of better than 50 such students in addition to approximately 12 post doctoral residents. This includes providing a 14 week annual lecture / training series for the graduate students, post docs, and new clinicians. Additionally, I have provide training workshops in regional training events.

In 2002, I began a small private practice which has grown into a small forensic practice. Predominantly, my work in the private practice is involved with forensic evaluation and consultation in criminal, civil, dependency matters.

In 2003, I was appointed by Governor Rendell to the Pennsylvania Sexual Offender's Assessment Board. This board is comprised of various professionals with expertise in sexual violence, and sexual offense evaluation, treatment, and management. As a member of the Board, I perform Sexually Violent Predator Assessments (commonly known as Meagan's Law Assessments) for the prosecution in Philadelphia, Delaware, Montgomery, Berks, and Bucks Counties in Pennsylvania. In addition, I provide feedback to the Board on questions by legislative groups, and participate in other policy discussions such as the Act 21, Juvenile Civil Commitment Sub-Committee.

With regard to academic appointments, I am an Adjunct Faculty member in the Department of Psychology at Rutgers University, Camden. I have taught at Rutgers Department of Psychology continuously since 2001, and taught in the Department of Education from 1995 to 1997.  In this capacity I have taught a wide range of undergraduate courses including: Psychology & The Law (Forensic Psychology), Personality Psychology, Educational Psychology, Abnormal Psychology, Psychology of Adolescence, Psychology of Childhood, Social Psychology, and Consumer Psychology As part of my training of graduate students at JJPI, I was appointed as an Assistant Professor in the School of Social Work, at Smith College, this past year. I have previously held academic appointments at Medical College of Pennsylvania, where I contributed to educational programs for Medical Students, Psychiatry Residents, other professionals. I was also an Adjunct Faculty member, teaching various courses to Master's and Doctoral level graduate students in Psychology, at the Graduate School of Education of the University of Pennsylvania.

With regard to research, I have published both my dissertation and an article I co-authored with Drs. Deblinger, Feiring, and Hoch from UMDNJ. In addition, I presented research findings on a comorbidity study at the Pennsylvania Psychological Association in 1993. Currently, I am working with Dr. David Burton of Smith College on a project examining gender differences in youth with sexual behavior problems as well as a treatment outcome study of child victims of sexual abuse. In addition, I am involved in a project exploring various aspects of adult Internet sexual offenders.

In an effort to remain current with information in the areas of sexual victimization and offending I regularly read professional journal articles and participate in continuing education in excess of what is required by the licensing standards of my profession. As part of my work with the Sexual Offender Assessment Board, I participate in regular training with international experts in the field of sexual abuse and sexual offense. I have attached a copy of my continuing education log to this letter.

I have reviewed Dr. Edelman's credentials as provided in the letter by Ms. Morgan-Kelly. Notable on Dr. Edelman's C.V. are her appearances on television programs. I too have been consulted by journalists and made numerous appearances on various news programs and in community forums to provide information about child sexual abuse, sexual offending, child abduction, other topics with sexual violence, as well as addiction and other areas of behavioral health from the mid 1980's. I don't include this on my C.V., as I don't view this as a significant professional experience, but rather part of my role in the community as an educator and a public mental health clinician.

As you can see from Dr, Edelman's vitae, she too attended a two year pre-doctoral internship at UMDNJ-SOM, Center for Children's Support, shortly after I completed my work at the Center. However, our credentials take very different paths outside of this internship. For Dr. Edelman, her 2 year internship at UMDNJ appears to be the only supervised training experience she has had in sexual abuse. Dr. Edelman's C.V. represents that she then spent an additional two years in what appears to be activities related to her dissertation research at the Center, and assisted in providing prevention training in schools. Given the standard practice of that clinic to hire individuals as post doctoral residents or licensed psychologists and on occasion an LCSW, it appears unlikely that any of her experience at the Center was a paid professional experience. According to her C.V., Dr. Edelman has not yet completed any postdoctoral training / supervised clinical experience in child sexual abuse, or any other clinical area. Postdoctoral supervised experience is required to be eligible for licensure as a psychologist in PA. and elsewhere in the U.S. and Canada. Likewise, looking at her other experience prior to her internship at the Center, Dr. Edelman reported private practice in general counseling and worked in employment/vocational counseling. She notes approximately 20 years of experience, the majority of that time in private practice, though whether this experience is full or part time is not specified. Her years providing service in the private practice however appears to have been largely part time in that her time at the Center during internship and dissertation related work, as well as her time at Main Line Rehabilitation Associates, working with brain injured individuals adjusting to their disability or assisting with improving their cognitive skills, was concurrent with the time Dr. Edelman reported being in private practice. Dr. Edelman's earlier experience (1981-1983) was as an Educational Consultant and working with vocational counseling. However, in none of these experiences did Dr. Edelman appear to train in sexual abuse beyond her internship.

Dr. Edelman is licensed as a Licensed Professional Counselor (LPC). LPC's are licensed to provide counseling, not perform evaluation, diagnosis, and other services defined in the scope of practice of psychologists.

4

With regard to the sexual abuse of children, the far majority of people who molest children are males who are related to the victim or members of the victim family's household for sometime. These men are often the stepfathers, biological fathers, mother's paramours, or other family members or friends residing with the family. Studies have shown that these men account for as much as 80% of those who molest children (Finkelhor, 1984) These members of the victim's nuclear family not only have access to the child, but also have an established trust relationship on which they can build, to erode boundaries and establish sexual access to the child. These incestuous or intrafamilial child molesters tend to function somewhat differently than extrafamilial molesters, that is individuals who do not have natural access to the child in the family. Extrafamilial child molesters have to go to greater means to obtain access and privacy with a child, in order to molest. Hence, their patterns of non-sexual contact with the child victim tend to be either frank attacks or through a protracted period of conditioning the child to overcome the barriers to molestation, frequently referred to as "grooming."

The current matter before the court is an extrafamilial situation. The alleged victim wasn't raised in the same household residing with Mr. Schnieder. Rather, he came to live with Mr. Schnieder between 1 to 4 weeks (according to the discrepant stories by the alleged victim) prior to the initiation of the alleged abuse. Hence, a very short time elapsed, not nearly enough time for a virtual stranger to induct a pubescent child into sexual contact.

Additionally, it should be noted that extrafamilial child molesters show patterns of greater sexual deviance and disturbance than intrafamilial offenders or normals. These studies have indicated that a larger proportion of extrafamilial child molesters, as compared to incest offenders, engage in deviant sexual fantasies, that is sexual fantasies of children (Freund & Watson, 1999; Abel, Becker, Cunningham-Rathner, Mittleman, Murphy, and Pouleau, 1987). Further, other studies have indicated that these offenders show significantly higher amounts of deviant sexual arousal than normals (Abel, Becker, Murphy, & Flanigan 1981; Quinsey et al. 1975; Quinsey et al. 1979; Murphy et al., 1984). In addition, these extrafamilial offenders have a higher incidence of other paraphilias, that is disorders of sexual appetites (Abel & Rouleau, 1990). Other studies have indicated a higher likelihood for such offenders to have a personal history of sexual abuse as a victim and to have started acting out sexually at an earlier age, usually adolescence (Pithers, Beal, Armstrong, & Perry, 1989; Hanson & Slater, 1988; Dhawan & Marshall, 1996). Hence, these findings support the thinking that extrafamilial child molesters would be more preoccupied with deviant sexual fantasies than incestuous offenders or normals. They are more likely themselves to have been victims of sexual violence, and have started sexually acting out sometime in adolescence. Hence overall, extrafamilial child molesters are generally more disturbed, have longer histories of engaging in sexually deviant fantasy and acting on those urges in sexual abuse with children. This is a picture of functioning that is very different from the history of the defendant in the current matter presents. Outside the instant offense, the defendant has no known history of sexually deviant fantasy or arousal. There is no known history of Mr. Schnieder engaging children in a sexual manner, outside the allegations of the instant offense. Further, no evidence of sexually deviant preoccupation, endemic to such offenders, has been evinced across his life during the current investigation.

As noted above. grooming is a process engaged in by a perpetrator of child sexual abuse to build a bridge of trust and connection to the minor child that will permit for sexual access. Gillespie (2002) offers the following definition: " The process by which a child is befriended by a would-be-abuser in an attempt to gain the child's confidence and trust, enabling them to get the child to acquiesce to abusive activity. It is frequently a pre-requisite for an abuser to gain access to a child."

Grooming does occur in many cases of child sexual abuse. In extrafamilial situations grooming tends to be more protracted, requiring more time, than in incest situations where access and trust are already established. As noted in the definition above, the purpose of grooming is to aid a perpetrator to gain trust and access to a child in order to facilitate victimization. In "grooming" a perpetrator initiates a positive non-sexual relationship with a child, embellished with praise, recognition, access to desired activities, or other inducements, which over time facilitates an emotional connection between the adult and the child. In situations were the perpetrator is from outside the family circle, this will require time to develop. Basic barriers such as a lack of trust of strangers, needs to be bridged before a perpetrator can develop the connection, trust, and contact necessary to promote the relationship to victimization. Over time this relationship and ensuing trust builds, and the perpetrator introduces sexualized topics, touching or other such behavior in a neutral manner, to normalize and reinforce the behavior. Eventually these behaviors brought together facilitates access to introducing and normalizing simple touching, and increases to more complex sexual behaviors with the child victim (Craven, Brown, & Gilchrist, 2006; Berliner & Conte, 1990; Conte, Wolf, & Smith, 1989).

It should be noted that in retrospect when viewing a situation where there are allegations of sexual misconduct by an adult on a child, many observers may construe any positive interaction, charity, giving, support, or simple kindness, as grooming. However, without the allegations, the same initial behaviors might be seen as someone caring for a child. In an age appropriate relationship between consenting adults, this same complex of behaviors and attitudes might well be seen as courting (Craven, Brown, & Gilchrist, 2006). As the touching begins and moves to more sexualized behavior, such perception of benevolence is clearly lost.

In the current matter, the alleged child victim was 12-13 years of age at the time Mr. Schneider met the youth and is alleged to have quickly (within a couple or few weeks) begun sexually abusing him. The available documents allege that the relationship quickly turned to victimization. Hence, given Mr. Schnieder's status as an individual without a prior established relationship to the child or the family, there was a very short time between the child's regular contact with Mr. Schnieder and the alleged sexual abuse, with little time for grooming.

It is not unusual for child victims of sexual abuse to not tell parents or other adults that they are being a victim of sexual abuse. Studies have reported between 30 and 80% of children purposefully do not disclose sexual abuse (Arata, 1998; Lawson & Chaffin, 1992; Pine & Hanson, 2002). Younger children, under the age of six are the least likely to disclose, likely due to developmental factors (Paine & Hansen, 2002; Goodman, Edelstein, Goodman, Jones, & Gordon, 2003). The reasons are varied and can be in response to threats made by a perpetrator; in younger children, not

understanding that abuse occurred; in older children, embarrassment; and a myriad of other reasons. Clinical reports and research have shown girls tend to report more freely than boys, with a large percentage of boys never telling. Delays in disclosure across respondents were on average 5 years (Herbert, Tourigny, Cyr, McDuff, & Joly, 2009) and some studies showing a range of 3-18 years (Lamb & Edgar-Smith, 1994). Male socialization and social mores on male behavior and attitudes appear to dramatically influence a male's tendency to withhold disclosure (Sorisol, Kia-Keating, & Grossman 2008). Telling often comes in conjunction with some crisis or with a recognition that doing so will help and appears to be mediated by multiple variables including gender, cultural expectations, fear, embarrassment, homophobia, and other factors. However, it is worth noting that sometimes such disclosures of allegations are made for purposes driven by other motives than healing, are purposeful and sometimes even directed for attempts at personal gain.

The relationships that develop between a child victim and a perpetrator appear to develop across a number of stages. Many authors have offered models for considering the development of such relationships, I shall comment on two of the more dominant models in this domain. Finkelhor (1984) described a model for understanding the sexual abuse of children, referred to as the Four Preconditions Model of Sexual Abuse. This model suggests that four pre-conditions are necessary for abuse to occur. 1. There must be an offender who is motivated to sexually abuse. 2. the offender must overcome internal inhibitions or obstacles to abuse the child. 3. the offender must overcome external obstacles against abusing the child, 4. the offender must overcome the resistance by the child. The first two pre-conditions apply to the offender and as such are requisites for sexual abuse to occur. Accessibility of children and opportunity to form relationships with children alone are not adequate. Rather, an offender with a specific disposition toward eroticizing children, which fuels motivation, to overcome his inhibitions, societal mores, laws, moral mandates, and other obstacles are required for molestation to occur in this model. Ward, Louden, Hudson, & Marshall (1995) offer another model of the offense chain and here also signify the importance of multiple consecutive stages developing across time for the perpetrator to obtain trust and access to the child. Ward et al (1995) suggest that contact with the child doesn't occur until stage three and the sexual offense itself doesn't occur until stage seven, followed by even more cognitive restructuring efforts to maintain the abusive relationship.

Hence, the description of the alleged initial sexual offense, the youth receiving fellatio on the pullout couch within the first couple weeks (in one report) of coming to live with the defendant would appear to be more of a direct assault, than the result of a groomed relationship to promote victimization when considered by these models.

Child molesters use a variety of subtle to overt methods for controlling their victims and maintaining that control. These are as subtle as being a gateway for the child to a better life, money, access to enjoyable activities, etc. They can be marked by more direct methods of control, such as the use of threats, interpersonal or physical coercion, or physical violence (Deblinger & Heflin, 1997; Finkelhor, 1986).Likewise, these are different depending on the age of the victim. Younger children are more vulnerable to confusion and not knowing societal rules or norms for behavior, more fantastical stories, or even the use of a simple rouse to facilitate proximity. Pre-teens,

would see right through such simplistic constructions. Hence, older children may require a more calculated and therefore protracted period of induction. Such an induction would likely parallel a seduction over time.

    I hope my input has been helpful to provide some basic information with regard to sexual abuse and offending As ever, I remain available to discuss or expand on any of these topics, or provide additional information as necessary.

    The opinions I have expressed here are all opinions that I hold within a reasonable degree of psychological certainty.

Respectfully,

Thomas F. Haworth, Ph.D.
Licensed Psychologist