IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 10-29 |
| | : | |
| | : | |
| KENNETH SCHNEIDER | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                              **September 21, 2011**

On October 1, 2010, Defendant Kenneth Schneider was convicted by a jury of traveling in foreign commerce with the intent to engage in sex with a minor between the ages of 12 and 16, in violation of 18 U.S.C. § 2423(b) (Count I), and transporting a person in foreign commerce with the intent that such person engage in criminal sexual conduct, in violation of 18 U.S.C. § 2421 (the Mann Act) (Count II).  Schneider asks this Court to enter a judgment of acquittal on both Counts, to dismiss the Indictment or arrest judgment, or to grant a new trial.  For the reasons that follow, this Court will grant in part and deny in part Schneider's motion.

**FACTS**[1]

The charges against Schneider, an American citizen who, in 2001, was 36 years old, stem from his travel on August 22, 2001, from the United States to Russia in the company of Roman

---

[1] In reviewing a post-verdict motion challenging the sufficiency of the evidence, a court must review the evidence "in the light most favorable to the Government, and credit all reasonable inferences that support the verdicts."  *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002).  Where, as here, the defendant moves for judgment of acquittal after the close of the Government's evidence and the court reserves its decision on the motion, a court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).  Accordingly, in weighing the sufficiency of the evidence as to Count II, this Court shall consider only the evidence introduced during the Government's case-in-chief.

Zavarov, a 15-year-old Russian boy. At the time of his travel, Schneider had housed Zavarov in his Moscow apartment for three years and, during the year immediately preceding the flight, had engaged in regular sexual activity with him.[2]

Schneider first met Zavarov in 1998 when Zavarov was 12 years old. Zavarov had recently been forced to leave a prestigious ballet training program in Russia at the Moscow Academy of Ballet (the Academy)–also known as the Bolshoi Academy–after his parents became unable to pay his dormitory fees. Zavarov's parents wanted their son to continue his ballet training and considered sending him to a ballet school in St. Petersburg, where he had a scholarship. In the summer of 1998, however, two of Zavarov's former Academy instructors, Nikolai Dokukin and Tatiana Dokukina, raised the possibility of securing payment for Zavarov's education at the Academy from Schneider, a ballet afficionado, who had told the Dokukins he was interested in creating a charitable organization to provide scholarships to talented arts students in Russia.

At the time, Schneider was working in Moscow as an attorney and had became acquainted with the Dokukins because of his interest in ballet. After meeting the Dokukins, Schneider became involved at the Academy, donating furniture to the Academy, paying for ballet footwear for the students, and providing grants to the instructors. He also visited ballet classes at the Academy and videotaped the students, telling Dokukina he planned to send the videos to his friend, Olga Kostritzky, an instructor at the School of American Ballet. Within a month of meeting Schneider, Dokukina told him about Zavarov's financial troubles and asked if he would be willing to sponsor

---

[2] Although the Government asserted Schneider sexually molested Zavarov for the entire three-year period preceding their travel to the United States, this Court limited evidence of such illicit sexual conduct to the period between August 22, 2000, and November 22, 2001, pursuant to Federal Rule of Evidence 403. *See* Memorandum, Sept. 3, 2010, Doc. 95.

Zavarov's ballet education. Schneider indicated he might be interested, but told Dokukina he wished to meet Zavarov and see a demonstration of his ballet ability before agreeing to sponsor him.

Schneider and the Dokukins went to Zavarov's house and asked him to perform a number of ballet exercises. Schneider videotaped this demonstration, during which Zavarov was dressed in only a pair of black underpants.[3] During the demonstration, Dokukina told the Zavarovs, "if you show this recording, they will grab him for ballet and throw you into the bargain. They'll be asking where did you dig up this treasure?" Trial Tr. vol. 2, 41. Dokukina testified that having such a tape would provide Zavarov a "huge chance to be admitted to [a ballet] school." *Id.* at 60.

Zavarov's parents were interested in having Schneider finance their son's education and agreed to additional meetings with Schneider. During one of these meetings, Zavarov's father asked Schneider for a loan so that he could repay the debt he owed to the Academy for Zavarov's delinquent dorm fees. Schneider agreed, loaning Zavarov's father 4,300 rubles, approximately $470 at the time. A notary public in Russia drafted a loan agreement, which was signed by Schneider and Zavarov's parents, requiring the Zavarovs to repay the loan over four months, with the final payment due December 31, 1998.[4]

At another meeting, Schneider told Zavarov's father that after Zavarov re-enrolled at the Academy he would not live in the dormitory, but would instead live with Schneider. Schneider explained he could provide better accommodations because Zavarov would have his own room in

---

[3] Zavarov's mother testified that, although she felt uncomfortable that Zavarov was not fully dressed, such limited dress is necessary for ballet demonstrations as it enables a viewer to see all of the dancer's movements.

[4] Although the final loan payment was due at the end of 1998, the Zavarovs did not fully repay the debt until August 5, 2000.

Schneider's apartment, would get better rest and better food, and would have access to a personal ballet instructor. Although this arrangement made Zavarov's father uncomfortable, he felt he had to agree to it to ensure his son was able to re-enroll at the Academy. Before Zavarov moved in, the Zavarov family visited Schneider's apartment, a two-room apartment with one small bedroom and a larger main room. Schneider told the Zavarovs he would sleep in the bedroom and Zavarov would sleep on a pull-out couch in the main room. The Zavarovs were satisfied that this was an appropriate sleeping arrangement for their son.

When the new school term started, Zavarov began living with Schneider from Monday to Friday, returning to his parents' home on weekends, holidays, and in the summer. Schneider discouraged Zavarov's father from visiting him during the week, telling him Zavarov had everything he needed. While at Schneider's apartment, Zavarov was primarily taken care of by a woman who lived across the hall from Schneider, Ludmila Kozyreva. Kozyreva woke Zavarov up, prepared his breakfast, helped him get ready for school in the morning, watched him after school, and prepared his dinner. Because the Zavarovs did not know Schneider well, Zavarov's father advised his son to tell Kozyreva if he was sexually molested by Schneider.[5] During the time Zavarov lived with Schneider, Schneider paid for his food and some of his clothing and purchased other items for Zavarov, including a Playstation video game console and a bicycle. Schneider also paid for Dokukin to provide private dance lessons to Zavarov in Schneider's apartment, and bought Zavarov a cellular phone.

In 2001, when Zavarov was 15 years old, Schneider encouraged Zavarov to apply to summer

---

[5] Zavarov never told Kozyreva that Schneider was molesting him, though he sought her help on one occasion when Schneider became angry after Zavarov's father appeared at the apartment unannounced.

ballet programs in the United States and elsewhere, and offered to take Zavarov to Philadelphia so he could study at the Rock School. Zavarov testified that in the year before he and Schneider traveled to the United States, Schneider had been engaging in oral and anal sex with him approximately three to four times a week, with the encounters typically taking place at night in Schneider's bedroom.[6] Schneider told Zavarov to keep these encounters secret because people would not understand their relationship, and Schneider would go to jail.[7] Schneider also told Zavarov that if Schneider was gone, Zavarov "[wouldn't] be able to fulfill [his] dreams as a ballet dancer and [would] stay in Russia." Trial Tr. vol. 1, 16.

Zavarov also testified that Schneider had previously told him their relationship was similar to the relationship of the famous Russian ballet dancer, Vaslav Nijinsky, and his mentor and director, Sergei Diaghilev. When Zavarov was 13, Schneider showed him *Nijinsky*, a film that depicts Diaghilev and Nijinsky as lovers, and suggests that Nijinsky was emotionally destroyed after he ended his relationship with Diaghilev to pursue a heterosexual marriage.[8] After the film, Schneider told Zavarov that Nijinsky made a mistake by leaving Diaghilev, and warned him not to make the same mistake. Schneider also told Zavarov relationships with girls were disgusting, and Zavarov should avoid girls because they would take advantage of him. That same year, Schneider gave Zavarov a birthday card inscribed with the message, "Romanicov, until trillion thirty years, your

---

[6] Schneider denied ever having had any sexual contact with Zavarov.

[7] Schneider also worried the effects of his contact with Zavarov would be discovered by a nurse at the Bolshoi Academy, and told Zavarov if the nurse asked about any injuries to his rectum, he should say he was using a hemorrhoid stick. When the nurse attempted to examine Zavarov, Schneider called the school to complain about her, and she was eventually fired.

[8] At trial, the Government played portions of this movie to the jury, including a portion in which Nijinsky's character simulated masturbation during a ballet performance.

friend, Ken," and told Zavarov they should be together "until trillion thirteen years." Trial Tr., vol. 1, 18. Before they traveled to the United States, Zavarov thought of Schneider as his friend and role model. In an essay he wrote as part of a school application, Zavarov said Schneider had made him very happy by re-enrolling him in the Academy and by helping him with any problems he had, and described Schneider as a "friend" and "second father." Trial Tr. vol. 1, 141.

Schneider helped Zavarov complete his application for the Rock School, which admitted Zavarov to its summer program and awarded him a scholarship, which paid for Zavarov's travel to and from Philadelphia. After his acceptance to the summer program, Zavarov and his parents went to the United States Embassy in Moscow to apply for a travel visa. In the application, Zavarov's parents authorized Schneider to take Zavarov to the United States from July 4, 2001, until August 31, 2001. When Schneider and Zavarov traveled to Philadelphia, Zavarov stayed with Schneider's parents at their home in Berwyn, a suburb of Philadelphia. Schneider did not stay at the Berwyn home for the summer because he was traveling for work, although he visited Zavarov there occasionally. While Schneider and Zavarov were in United States, they did not engage in any sexual activity, though Schneider held Zavarov's hand, hugged him, and kissed him once.

On August 22, 2001, Schneider and Zavarov flew from Philadelphia to Moscow. After arriving in Moscow, Zavarov went to his parents' house and stayed with them for a week before he returned to school. When Zavarov returned to school and moved back into Schneider's apartment, the sexual activity between Schneider and Zavarov resumed, and continued to occur two to three times per week.

Zavarov never told his parents that he had been sexually abused by Schneider. After he began living with Schneider, however, his personality changed. His father noticed he was more

withdrawn and silent, and seemed to be keeping something to himself. Zavarov eventually moved to the United States and, in 2008, Zavarov told his girlfriend, Gina D'Amico–whom he has since married–about Schneider's sexual molestation, revealing that Schneider had sexually abused him while he lived with Schneider in Russia.

On August 12, 2008, Zavarov filed a civil lawsuit against Schneider and others, bringing claims stemming from Schneider's sexual abuse. After Zavarov filed his lawsuit, he was contacted by the Federal Bureau of Investigation, which thereafter launched a criminal investigation into Schneider's conduct with Zavarov. On January 14, 2010, Schneider was charged in a two-count indictment with (1) traveling in foreign commerce for the purpose of engaging in sex with a minor, in violation of 18 U.S.C. § 2423(b) (Count I), and (2) transporting a person in foreign commerce with the intent that such person engage in criminal sexual conduct, in violation of 18 U.S.C. § 2421 (Count II). Schneider was convicted of both charges on October 1, 2010, following a jury trial.

**DISCUSSION**

Schneider asks this Court to enter a judgment of acquittal on both Counts, arguing the evidence presented at trial was insufficient to support the verdict on either Count. In the alternative, he seeks dismissal of the Indictment, contending this Court lacks jurisdiction over the offenses charged and the statutes he is charged with violating are facially unconstitutional and unconstitutional as applied to him. Finally, Schneider argues the introduction of unduly prejudicial evidence at trial entitles him to a new trial.

A court "must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction."[9]  Fed. R. Crim. P. 29(a).  A court must find the evidence at trial

was insufficient to sustain a conviction if a rational trier of fact could not have found proof of guilt

beyond a reasonable doubt.  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  In reviewing

the sufficiency of the evidence, a court must not "usurp the role of the jury by weighing credibility

and assigning weight to the evidence, or by substituting its judgment for that of the jury" and should

only find insufficient evidence "where the prosecution's failure [to prove its case] is clear."  *Id.*

Schneider argues the evidence at trial was insufficient to sustain his convictions because the

Government failed to prove (1) a dominant purpose of his travel and transportation of Zavarov was

illegal sexual activity, (2) he transported Zavarov with intent to violate Article 133 of the Russian

Criminal Code,  (3) and he intended to compel Zavarov to engage in sexual activity, because (4)

Zavarov was materially or otherwise dependent upon him.

Schneider first asserts the evidence at trial was insufficient to sustain his convictions because

a rational jury could not have determined he traveled and transported Zavarov for the purpose of

illegal sexual activity.  Count I of the Indictment charged that Schneider traveled in foreign

commerce on August 22, 2001, "for the purpose of engaging in any sexual act;" specifically, for the

purpose of engaging in a sexual act with Zavarov, a person who had reached the age of 12 but had

not yet reached the age of 16.  Indictment Count I ¶ 6.  At the close of trial, this Court instructed the

jury that in order to prove Schneider was guilty of Count I, the Government must prove beyond a

reasonable doubt (1) Schneider was a United States citizen, who (2) traveled in foreign commerce

on August 22, 2001, (3) for the purpose of engaging in sexual activity with a minor, and (4) the

---

[9] Schneider preserved his sufficiency of the evidence challenge by moving for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a) on both Counts at the close of the Government's case.  This Court denied his motion as to Count I and reserved ruling on Count II.

specific sexual act he intended to engage in was a sexual act with someone between the age of 12 and 16. *See* Trial Tr. vol. 8, 140, Sept. 30, 2010. Schneider does not contest that he is a United States citizen who traveled from the United States to Russia on August 22, 2001, or that Zavarov was 15 on the date of travel. Instead, he argues the Government did not present sufficient evidence to prove the purpose of his travel was to engage in illegal sexual conduct.

To secure a conviction pursuant to § 2423(b), the Government is not required to prove criminal activity was *"the* dominant purpose of interstate travel." *See United States v. Hayward*, 359 F.3d 631, 638 (3d Cir. 2004). Instead, when multiple motives for interstate travel exist, the Government must prove illegal sexual activity was "a dominant purpose" of the defendant's travel. *Id.*; *see also United States v. Vang*, 128 F.3d 1065, 1072 (7th Cir. 1997) (explaining "[d]espite the contrary implication suggested by the word 'dominant,' an immoral purpose need not be the most important of defendant's reasons when multiple purposes are present" (quoting *United States v. Snow*, 507 F.2d 22, 23 (7th Cir. 1974)); *United States v. Campbell*, 49 F.3d 1079, 1082-83 (5th Cir. 1995) (holding, with regard to a § 2421 conviction, a jury may find a "dominant purpose" to engage in illegal activity existed when such activity is "'one of the efficient and compelling purposes'" or "one motivating purpose" of the defendant's travel (citation omitted)).[10] In evaluating whether trial evidence proved an illicit travel purpose in "cases in which the travel prosecuted under [§] 2423(b) may have had dual purposes, only one of which was to have sex with minors," a court must consider whether a rational juror could have found illicit intentions were the but-for cause of the travel, asking "whether, had a sex motive not been present, the trip would not have taken place or would have

---

[10] As the Seventh Circuit explained, "[j]udicial interpretations of the Mann Act (§ 2421) necessarily color [courts'] reading of § 2423(b)" because they are "part of the same general legislative framework" and "employ[] the same 'for the purpose of' phrase." *Vang*, 128 F.3d at 1069.

differed substantially." *United States v. McGuire*, 627 F.3d 622, 624-25 (7th Cir. 2010).

At trial, the Government presented evidence showing Schneider engaged in frequent sexual activity with Zavarov from August 2000 until sometime in July 2001. That same month, Schneider flew with Zavarov and then accompanied him to Schneider's parents' house in Berwyn. For the next two months, Schneider was traveling elsewhere and only occasionally spent time at the Berwyn home. At the end of August, following the conclusion of Zavarov's summer ballet program, Schneider returned to Berwyn, picked up Zavarov, traveled to the airport with him, and boarded a plane to Moscow with him. Schneider argues because he lived and worked in Moscow, and thus had a need to return there independent of any sexual relationship with Zavarov, the jury could not reasonably have found the desire to resume sexual activity with Zavarov was a dominant purpose of his return travel to Moscow. However, because Schneider flew from Pennsylvania with Zavarov at the conclusion of Zavarov's summer program, the jury could have reasonably inferred that Schneider did not choose the location or date of his travel to Moscow for business or personal reasons, but rather flew on that day and from that location to further his intent to resume his sexual activity with Zavarov. The evidence was therefore sufficient to permit a rational juror to find a dominant purpose of Schneider's August 22, 2001, travel to Moscow was to engage in sex with Zavarov. *See id.* at 626 (holding a priest who traveled internationally to hold spiritual retreats also traveled for the purpose of engaging in illicit sex because he "configured his travels to optimize his [illicit] sexual activity").

Schneider similarly argues the evidence presented at trial was insufficient to sustain his conviction for a violation of § 2421. Count II of the Indictment charged

> [o]n or about August 22, 2001, in the Eastern District of Pennsylvania, and elsewhere, defendant KENNETH SCHNEIDER transported a person in foreign

commerce with the intent that such person engage in any sexual activity for which any person can be charged with a criminal offense, to wit, defendant SCHNEIDER transported [Zavarov], . . . from Philadelphia, Pennsylvania to Moscow, Russia with the intent that [Zavarov], under compulsion based on [Zavarov's] dependence on Schneider, engage in anal intercourse, which would be a violation of Article 133 of the Russian Criminal Code. All in violation of Title 18, United States Code, Section 2421.

Indictment Count II ¶ 2. At the close of trial, this Court instructed the jury that in order to prove Schneider was guilty of Count II, the Government must prove beyond a reasonable doubt that (1) Schneider knowingly transported Zavarov in foreign commerce, (2) with the intent that Zavarov engage in criminal sexual activity with Schneider, and (3) Schneider specifically intended to compel Zavarov to engage in sodomy by taking advantage of Zavarov's material or other dependence on Schneider. *See* Trial Tr. vol 8, 143. The jury was further instructed, "the Government need not prove that a criminal sexual act was the sole purpose for Schneider transporting Zavarov to Russia, but the Government must prove that it was a dominant purpose as opposed to an incidental one." Trial Tr. vol. 8 , 144.

Schneider asserts the evidence was insufficient to show his primary purpose in transporting Zavarov from Philadelphia to Moscow was to engage in illegal sexual activity, arguing because he did not pay for Zavarov's transportation, and because Zavarov's flight to Moscow was necessary to return him to his parents' home and the Bolshoi Academy, no reasonable jury could conclude Zavarov was transported by Schneider for the purpose of engaging in criminal sexual activity. Alternatively, Schneider argues even if the evidence was sufficient to prove his intent in transporting Zavarov to Moscow on August 22, 2001, was to engage in criminal sexual activity, such illicit motivations on that date cannot have been his dominant purpose as a matter of law because no illegal sexual activity took place during Zavarov's time in Philadelphia, and it is inappropriate to examine

Schneider's intent only with regard to Zavarov's return trip to Moscow. Schneider argues that, viewing the trip as a whole, no reasonable jury could conclude the dominant purpose of the trip was to engage in criminal sexual activity.[11]

In support of his argument, Schneider relies on *Mortenson v. United States*, 322 U.S. 369 (1941), a case in which the Supreme Court overturned a Mann Act conviction, holding two owners of a Nebraska house of prostitution who vacationed in Utah with two of their prostitute-employees did not transport the women back to Nebraska "for the purpose of" furthering illegal sexual activity because the entirety of the trip was recreational and included no acts of prostitution or immorality. Although the transported women resumed their activities as prostitutes within ten days of returning from the vacation, the Court ruled the women's resumption of prostitution was unrelated to the Mortensons' transportation of the women from Utah to Nebraska. *Id.* at 376.

In *Mortenson*, the Court explained the jury could have "assumed [the Mortensons] anticipated that the two girls would resume their activities as prostitutes upon their return to [Nebraska]," but held such anticipation, without more, does not "operate to inject a retroactive illegal purpose into the return trip[,] . . . [n]or does it justify an arbitrary splitting of the round trip into two parts so as to permit an inference that the [outbound] trip was innocent while the purpose of the homeward journey [] was criminal." *Id.* at 375. The Court further explained, "[t]he return journey under the circumstances of this case cannot be considered apart from its integral relation with the innocent round trip as a whole. There is no evidence of any change in the purpose of the trip during

---

[11] Because the Court finds this alternative argument has merit, the Court need not address the sufficiency of the evidence regarding Schneider's purpose in transporting Zavarov on August 22, 2001. This Court notes, however, the Government introduced no evidence that Schneider paid for or scheduled Zavarov's transportation.

its course.  If innocent when it began it remained so until it ended.  Guilt or innocence does not turn merely on the direction of travel during part of a trip not undertaken for immoral ends." *Id.*

In the years since *Mortenson* was decided, courts have infrequently applied its holding to prosecutions under § 2421, perhaps because it is uncommon for defendants operating houses of prostitution or sexually abusing minors to take their prostitutes or sexual abuse victims on vacations or other innocent journeys.  A review of cases that have discussed *Mortenson*, however, is instructive.  In the year after the decision was issued, the Third Circuit considered a case in which a defendant who employed a woman as a prostitute in Philadelphia took her on an innocent day trip to Atlantic City, after which she resumed her prostitution activities in Philadelphia.  *United States v. Oriolo*, 146 F.2d 152 (3d Cir. 1944).  Although there was no evidence any illegal activity took place during the Atlantic City trip, the court distinguished the case from *Mortenson* because, on the return trip, the defendant told the woman she would have to resume her prostitution once back in Philadelphia, and the court held this statement constituted evidence of a change in the purpose of the trip during its course.  *Id.* at 154.  The Supreme Court summarily reversed the court's judgment, citing *Mortenson*.  *Oriolo v. United States*, 324 U.S. 824 (1945).

Ten years later, the Supreme Court again summarily reversed a case in reliance on *Mortenson*.  *See Becker v. United States*, 348 U.S. 957 (1955).  In *Becker*, the Eighth Circuit reviewed the Mann Act conviction of a defendant who encouraged a woman employed as an exotic dancer–a profession viewed at the time as falling within the Mann Act's prohibition on sexual immorality–to travel across interstate lines.  *Becker v. United States*, 217 F.2d 555 (8th Cir. 1954).  The woman worked in Wisconsin, and traveled to Minneapolis to spend Thanksgiving with her mother and daughter.  When she embarked on her trip, she intended to return to Wisconsin, though

she had not determined the date of her return or purchased a round trip ticket.  After Thanksgiving, the woman became uncertain whether she still wished to return to Wisconsin.  Learning of her uncertainty, the defendant begged her to come back, then paid the cost of her return trip.  *Id.* at 556-57.  The Eighth Circuit held, because of this inducement, the jury could have concluded the woman did not return to Wisconsin because of her original intention to return, but was induced by the defendant to return and engage in illicit sexual activity.  The Supreme Court reversed, citing *Mortenson*.  *Becker*, 348 U.S. at *1.

Other courts have relied on *Mortenson*'s innocent round trip analysis to reverse Mann Act convictions after finding the purpose of a round trip journey was wholly lawful, even when the return trip delivered the transported person back to resume illicit sexual behavior.  *See, e.g., Smart v. United States*, 202 F.2d 874, 875 (5th Cir. 1953) (reversing Mann Act conviction where defendant's interstate transportation of two women who worked for her as prostitutes was for the sole purpose of resolving legal matters and where no act of prostitution took place during the trip); *United States v. Ross*, 257 F.2d 292 (2d Cir. 1958) (reversing conviction of defendant who took prostitute on weekend trips from New York to New Jersey upon finding it "clear beyond peradventure of doubt that [the defendant] and [the prostitute] considered these weekends as devoted to recreation and refreshment" apart from any illegal purpose); *cf. United States v. Hon*, 306 F.2d 52 (7th Cir. 1962) (reversing conviction of defendant who traveled with a female companion from Nevada to Maryland to visit the companion's mother, despite that the companion engaged in prostitution during the course of the trip, after holding there was insufficient evidence the defendant was involved in or encouraged the prostitution, making the illegal sexual acts merely incidental to the journey), *abrogated on other grounds by United States v. Snow*, 507 F.2d 22, 26 (7th Cir. 1974).

The Third Circuit recently reviewed a defendant's Mann Act conviction for transporting a minor among multiple states as part of a prostitution ring. *United States v. Williams*, No. 08-4895, 2011 U.S. App. LEXIS 10399 (3d Cir. May 23, 2011). In affirming the conviction, the court distinguished the defendant's actions from the actions of the defendants in *Mortenson*, stating "[i]n no sense was [the defendant's] transport of [the minor] a vacation, à la *Mortensen*, and more than sufficient evidence permitted the jury to conclude that he possessed the requisite intent for conviction- i.e., the 'calculated means for effectuating' [the minor's] prostitution." *Id.* at *10 (quoting *Mortenson*, 322 U.S. at 375).

The facts of the instant case are on point with *Mortenson*. Here, Zavarov applied to a number of ballet programs for the summer of 2001, and eventually decided to enroll at the Rock School in Philadelphia, which awarded Zavarov with a scholarship covering his tuition and transportation costs. Zavarov's parents applied for a travel visa with the American Embassy and authorized Zavarov to travel to and from the United States escorted by Schneider. Zavarov traveled to Philadelphia in July 2001, and returned a little over a month later, on August 22, 2001, after the conclusion of his summer program. Although Schneider accompanied Zavarov on his flight to Philadelphia, and delivered Zavarov to Schneider's parents' house, he visited the house sporadically throughout the summer. From July until August, Zavarov attended ballet classes. The Government concedes Schneider and Zavarov did not engage in sexual activity while Zavarov was in Pennsylvania. Viewing the round trip as a whole, it is apparent Zavarov's travel to Pennsylvania was solely for the purpose of continuing his ballet education. There is no evidence of any change in the purpose of his trip during its course, and his time in Pennsylvania constituted a complete interlude from Schneider's sexual activity with him insofar as no such activity took place in Pennsylvania.

Upon consideration of the record, the outcome in this case is controlled by *Mortenson*. Even if the evidence introduced at trial was sufficient for a jury to infer Schneider transported Zavarov on August 22, 2001, with the intent to engage in criminal sexual activity, such a conclusion can only be drawn if Zavarov's return trip to Moscow is examined in isolation, without consideration of the purpose of Zavarov's round trip journey to Philadelphia. Viewing the evidence in this manner is expressly prohibited by *Mortenson*, which denounced an "arbitrary splitting of [a] round trip into two parts so as to permit an inference that the purpose of the [outbound trip] was innocent while the purpose of the homeward journey [] was criminal." 322 U.S. at 375. Because the sole purpose of Zavarov's journey from beginning to end was to receive ballet instruction in the United States, and Schneider's transport of Zavarov to Philadelphia was therefore innocent as well, this Court cannot hold that Schneider's guilt "turn[s] merely on the direction of travel during part of a trip not undertaken for immoral ends." *Id.* Schneider's conviction for a violation of § 2421 must therefore be reversed. *See id.* at 376 ("People of not good moral character, like others, travel from place to place and change their residence. But to say that because they indulge in illegal or immoral acts they travel for that purpose, is to emphasize that which is incidental and ignore what is of primary significance.") (quoting *Hansen v. Haff*, 291 U.S. 559, 562-63 (1934)).

The Government concedes *Mortenson* remains good law, but argues this case is distinguishable because the purpose of Zavarov's trip to Philadelphia was not wholly innocent. Although conceding no criminal sexual activity took place during Zavarov's trip, the Government asserts the travel was still tainted by improper purpose because it was organized by Schneider to coerce Zavarov to continue submitting to his sexual abuse. The Government points to no evidence, however, justifying the inference Zavarov would have refused to continue engaging in sexual activity

with Schneider if he had not traveled to Philadelphia. *See Van Pelt v. United States*, 240 F. 346, 348 (4th Cir. 1917) (explaining a defendant cannot be seen to have used transportation to induce a woman to engage in illicit sexual activity where their sexual activity had been ongoing and there was no evidence the transportation served the purpose of "more surely, more readily, or more safely induc[ing] her to yield to his wishes"); *cf. Langford v. United States*, 178 F.2d 48, 52 (9th Cir. 1949) (holding a defendant used interstate transport to induce a woman to continue engaging in prostitution where the woman had twice left him, but was persuaded to return by the promise of the journey).

The Government also contends the instant case is distinguishable from *Mortenson* because, unlike the prostitutes in *Mortenson*, who were "under no obligation or compulsion of any kind to return to [Nebraska] to work [as prostitutes]," 322 U.S. at 372, Zavarov was being psychologically manipulated by Schneider insofar as he was not free to travel in the manner he would have preferred. The Government, however, points to no evidence suggesting Schneider compelled or coerced Zavarov to travel to Philadelphia or to later return to Moscow. Rather, Zavarov wanted to study ballet in the United States.

Schneider argues, if this Court determines his Count II conviction should be reversed pursuant to *Mortenson*, then his conviction under Count I should also be reversed on the same basis because the innocent round trip rationale should apply not only to Zavarov's transport but also to Schneider's travel. Schneider, however, points to no case in which a court has extended the rationale of *Mortenson* to a § 2423(b) violation. Moreover, Schneider's August 22, 2001, travel is distinct from Zavarov's August 22, 2001, travel. While Zavarov's trip was the return portion of a pre-planned, round trip journey from Moscow to Philadelphia, Schneider's August 22, 2001, flight did not constitute the conclusion of an innocent round trip to Philadelphia. Instead, Schneider's journey

occurred that day so he could escort Zavarov back to Russia after several weeks apart. As previously discussed, Schneider embarked on such travel to return in Zavarov's company to Moscow, where he could more readily resume his sexual abuse and run a reduced risk of detection. Because the Government presented evidence Schneider's travel to Moscow was not part of an innocent round trip, but was a flight made after he had traveled throughout the United States and elsewhere, the rationale of *Mortenson* does not apply, and it is not improper to focus only on Schneider's intent in making the trip from Philadelphia to Russia. As previously discussed, the evidence was sufficient to convict Schneider of violating § 2423(b).

Schneider brings further challenges to the sufficiency of the evidence underlying his § 2421 conviction, arguing the Government produced insufficient evidence to prove (1) he transported Zavarov with the purpose of violating Article 133 of the Russian Criminal Code, (2) he intended to compel Zavarov to engage in sexual activity, or (3) Zavarov was dependent upon him to such an extent that Schneider could take advantage of such dependence to compel Zavarov's participation in sexual acts. At the close of trial, this Court instructed the jury as follows:

> The Government has charged Kenneth Schneider with intent to violate Article 133 of the Russian Criminal Code, which establishes that the compelling of a person to perform sexual intercourse, sodomy, [a] lesbian act or other actions of sexual character by means of blackmail, threat of destruction, damaging or seizure of property or by taking advantage of the material or other dependence of the victim is a crime.

Trial Tr. vol. 8, 143. The Court stated one of three elements the Government must prove to secure a conviction on this count is "that Mr. Schneider specifically intended to compel Zavarov to engage in sodomy by taking advantage of the material or other dependence of Zavarov," and further instructed,

> [t]o show a person is materially dependent, the Government must prove the person

was financially dependent on another, so that if such financial support was interrupted or withdrawn, the dependent person is left without any means of sustenance or support.

Russian law also allows you to find a person was otherwise dependent. The Russian Criminal Code does not give an example of what other dependence is, so you as the jury, may at your discretion decide whether a person was otherwise dependent.

To prove Schneider compelled Zavarov to engage in sexual acts, the Government must prove Schneider knowingly took advantage of the material dependency or other dependency to compel Zavarov to engage in anal intercourse.

To knowingly take advantage of another's dependence, the Government must prove the defendant exerted some sort of pressure on his dependent's free will to suggest to the dependent that the material or other support on which he relied would be withdrawn, if he did not engage in the sexual act.

Such exertion of pressure must consist of words or acts by the defendant which would cause a reasonable person in the dependant's position to feel pressure to engage in sexual activity.

Compelling is not the same as allurement. If you find Schneider merely promised to give gifts or benefits to Zavarov in exchange for engaging in sexual behavior, you must find he did not compel Zavarov in violation of Article 133.

Trial Tr. vol. 8, 144-45. Schneider argues because Zavarov never lived with him full time and always had the option of returning to his parents' house for food and shelter, the evidence at best showed Schneider promised to give Zavarov gifts in exchange for engaging in sexual behavior. Because such allurement is not sufficient to prove compulsion under Russian law, Schneider asserts the Government presented insufficient evidence showing he compelled Zavarov to engage in sexual activity. The Government contends the evidence was sufficient for the jury to rationally infer Schneider took advantage of Zavarov's material and emotional dependence on him, arguing the implication that Zavarov would have been expelled from Schneider's apartment and the Academy if he refused to engage in sexual acts with Schneider constituted a "quid pro quo so obvious even a twelve-year-old could not have missed it." Gov't's Resp. 5. The Government further asserts, even if Schneider's financial support of Zavarov was not sufficient to prove Zavarov was materially dependent on him, the jury was instructed they could find evidence of "other dependence" which

19

Schneider took advantage of to compel Zavarov to engage in sexual acts with him.

Here, the jury heard evidence that when Zavarov and Schneider met, Zavarov had recently been withdrawn from ballet school because of his parents' inability to pay his dormitory fees. Schneider agreed to sponsor Zavarov's education and offered to house, clothe, and feed Zavarov during the week. He also loaned money to Zavarov's parents so they could repay their debt to the Academy.[12] Schneider purchased a cellular phone and other items for Zavarov, and paid for him to receive private ballet instruction. Such material support, although significant, is not enough to prove Zavarov was materially dependent on Schneider insofar as it does not show he would be "left without any means of sustenance or support" if Schneider's financial support was withdrawn. *See* Trial Tr. vol. 8, 144. Zavarov returned to his parents' home on the weekends, holidays, and during the summer, and his father provided him with some clothing for school. Given the high burden the Russian statute imposes to show a person was financially dependent, there was insufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt Zavarov was so financially dependent upon Schneider that he would have been left without any means of support if Schneider's material support was withdrawn.

The jury was also instructed, however, Russian law allowed it to find compulsion based on a person's "other dependence" on the defendant, and it was thus permitted to consider whether Zavarov was "otherwise dependent" on Schneider such that Schneider could have intended to take advantage of such dependence to compel Zavarov to engage in sexual acts. The evidence revealed

---

[12] The Government asserts this debt made Zavarov and his parents financially dependent upon Schneider, and Schneider took advantage of this dependence, of which the Government asserts Zavarov was aware. However, by the time Schneider and Zavarov traveled to the United States, the Zavarovs had repaid their loan to Schneider.

Zavarov became emotionally close to Schneider, viewing him as a friend and second father. Additionally, Schneider showed Zavarov a film about the ballet dancer Nijinsky and his older male patron and lover Diaghilev, telling Zavarov if he left Schneider the way Nijinsky left Diaghilev, he would suffer Nijinsky's fate of emotional ruin and psychological despair. Based on the close emotional relationship which developed between Zavarov and Schneider, and Schneider's suggestion that Zavarov would be emotionally devastated if he left Schneider, there was sufficient evidence for the jury to conclude Schneider compelled Zavarov to engage in sexual activity with him by taking advantage of Zavarov's "other dependence" on him.[13]

Schneider next brings a number of constitutional challenges, arguing his prosecution under § 2423(b) is (1) facially unconstitutional insofar as it unduly restricts his right to travel and (2) exceeds Congress's authority under the Commerce Clause, and his prosecution under § 2421 is unconstitutional as applied to him because (3) it is void for vagueness (4) invokes another country's criminal code, and (5) criminalizes conduct which is not a crime in the United States.

Schneider first argues Count I of the Indictment should be dismissed because it is facially unconstitutional as an undue restriction on his right to travel internationally. "While the right to travel is well-established, no federal court has ever held that an individual has a fundamental right to travel for an illicit purpose." *United States v. Bredimus*, 352 F.3d 200, 210 (5th Cir. 2003). Instead, the Third Circuit has explicitly rejected the argument that § 2423(b) impermissibly burdens the fundamental right to travel. *United States v. Tykarsky*, 446 F.3d 458, 472 (3d Cir. 2006) ("Congress clearly has a compelling interest in punishing individuals who travel interstate to engage

---

[13] Schneider also challenges the language of this jury instruction, arguing it was too vague to be constitutional. This Court's discussion of Schneider's argument will be addressed herein.

in illicit sexual activities with minors, and § 2423(b) is narrowly tailored to serve that interest.");

*accord United States v. Hornaday*, 392 F.3d 1306 (11th Cir. 2004) (holding Congress did not exceed

its Commerce Clause authority in enacting § 2423(b)); *United States v. Han*, 230 F.3d 560, 565 (2d

Cir. 2000) (same). Because the Third Circuit has held § 2423(b) does not unconstitutionally burden

the right to travel, Count I of the Indictment will not be dismissed on this ground.

Schneider also argues § 2423(b) unconstitutionally exceeds Congress's power under the

Commerce Clause.[14] This argument was also flatly rejected in *Tykarsky*, in which the Third Circuit

held § 2423(b) "fall[s] squarely within Congress's power" to regulate the use of the channels of

interstate commerce because it criminalizes "interstate travel with intent to engage in illicit sexual

conduct with a minor." 446 F.3d at 470 (emphasis omitted); *see also Bredimus*, 352 F.3d at 208

(holding § 2423(b) constituted a valid exercise of the power to regulate the channels of foreign

commerce as applied to an American who traveled to foreign countries with the intent to engage in

illegal sexual activity); *cf. United States v. Pendleton*, No. 10-1818, 2011 U.S. App. LEXIS 18565,

at *18 (3d Cir. Sept. 7, 2011) ("Congress's authority to regulate the *channels* of commerce is not

confined to regulations with an economic purpose or impact."). Schneider's argument therefore

fails, and Count I will not be dismissed on this ground.

Schneider next challenges the constitutionality of § 2421 as applied to him. First, he asserts

---

[14] Schneider urges this Court to adopt the position taken by the dissenting opinion in *United States v. Bianchi*, 386 F. App'x 156, 160-62 (3d Cir. 2010), which argued § 2423(c) exceeds Congress's power under the Commerce Clause to the extent it criminalizes non-commercial activity abroad. Not only is *Bianchi* inapposite because it addressed § 2423(c), and not § 2423(b), the provision at issue here, but the Third Circuit recently held § 2423(c) is a valid exercise of the power granted Congress under the Commerce Clause, even when applied to non-commercial sexual activity abroad. *See United States v. Pendleton*, No. 10-1818, 2011 U.S. App. LEXIS 18565, at *18 (3d Cir. Sept. 7, 2011).

it is void for vagueness because his prosecution incorporated an offense under Russian law which includes terms with uncertain meanings, has no official English translation, and is so ill-defined as to permit arbitrary enforcement thereof.  Section 2421 criminalizes "knowingly transport[ing] any individual in interstate or foreign commerce . . . with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense."  The Indictment charged the sexual activity in which Schneider intended to engage was a violation of Article 133 of the Russian Criminal Code, which criminalizes compelling a person to engage in a sexual act "by means of blackmail, threat of destruction, damaging, or seizure of property or by taking advantage of the material or other dependence of the victim."  William E. Butler, trans., *Criminal Code of the Russian Federation*, 86, 4th ed. (2004) (translating *Ugolovnyi Kodeks Rossiiskoi Federatsii* [UK RF] (Criminal Code) art. 133 (Russ.) (hereinafter Butler translation).[15]  In mounting his vagueness challenge, Schneider does not challenge the language of § 2421 itself, but challenges the Russian statute and the jury instruction regarding the statute.

The jury instruction regarding Article 133 was considered by this Court before trial, after Schneider filed a Notice of Issues of Foreign Law.  *See* Fed. R. Crim. P. 26.1 ("A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice.").  In his Notice, Schneider proffered a translation of Article 133, an expert analysis of this provision, and an explication of the rules of Russian criminal procedure, to the extent such rules were applicable to this case.  Thereafter, this Court held a hearing at which defense witness Professor

---

[15] Although it is now a crime in Russia to have sex with a person under 16 years of age, in 2001 the age of consent in Russia was 15, so the Government could not have charged Schneider with intending to violate Russian criminal prohibitions on engaging in sexual acts with a minor because Zavarov was 15 in August 2001.

William Butler, Ph. D., a law professor who has authored a Russian/English legal dictionary and has translated the Russian Criminal Code into English, testified as to the meaning of the terms in Article 133. In forming his opinion on the meaning of Article 133, Butler consulted between eight and ten commentaries on the Russian Criminal Code. Butler prefaced his opinion by stating the meaning of Russian law is difficult to ascertain because there is no official English translation of the Criminal Code, the Russian Criminal Code does not provide definitions for terms used in its criminal offenses, and there is no case law interpreting the Russian Criminal Code because there is no concept of precedent under Russian law.

Butler first provided his translation of Article 133 as, "[t]he compelling of a person to perform sexual intercourse, sodomy, lesbian act, or other actions of a sexual character by means of blackmail, threat of destruction, damaging, or seizure of property or by taking advantage of the material or other dependence of the victim." Butler translation, *supra*. Based on his translation of the RCC and his consultation of RCC commentaries, Butler analyzed the terms "compelling," "material dependence," and "other dependence" because the Indictment charged Schneider with transporting Zavarov with the intent that Zavarov, "under compulsion based on [his] dependence on Schneider, engage in anal intercourse" with Schneider. Indictment Count II ¶ 2. Butler stated the term "compelling" under Russian law is distinct from the use of force or threat of force. Instead, compelling is an objective, real pressure affecting the will of the victim and is weightier than allurements or promises of future benefit. He also stated "material dependence" in Russia means financial dependence, and indicated a person is financially dependent under Russian law if that person would effectively be left out in the cold without any means of sustenance if such dependence was interrupted. Next, he explained the term "other dependence" under Russian law is a catch-all

phrase which he believes was included in Article 133 to allow for consideration of other kinds of dependence, but he found no examples of what such other dependence may be.

The Government agreed with Butler's translation of the language in Article 133, but argued this Court should simply read the translated provision to the jury, without providing specific guidance as to the meaning of the terms used therein. Schneider objected, arguing this Court should instruct the jury on the meaning of the terms "compelling" and "material dependence" under Russian law, based on Butler's analysis. Agreeing with Schneider's position, this Court fashioned its jury instruction on Article 133 based on a transcription of Butler's testimony, including his testimony regarding the term "other dependence." With regard to "other dependence," this Court charged the jury as follows: "Russian law also allows you to find a person was otherwise dependent. The Russian Criminal Code does not give an example of what other dependence is, so you, as the jury, may at your discretion decide whether a person was otherwise dependent." Schneider argues this instruction was too vague to be constitutional and impermissibly permitted the jury to imbue "otherwise dependent" with any meaning it chose.[16]

A statute is void for vagueness if it "does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement." *J.S. v. Blue Mtn. Sch. Dist.*, No. 08-4138, 2011 U.S. App. LEXIS 11947, at *49 (3d Cir. June 13, 2011) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). A statute "so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally

---

[16] Schneider also argues the jury instruction regarding the terms "compelling" and "material dependence" were too vague. Because this Court found the evidence was insufficient to prove Zavarov was "materially dependent" on Schneider, this Court need not address whether these terms are too vague to withstand constitutional scrutiny.

fixed standards, what is prohibited and what is not in each particular case" does not provide fair notice of the conduct it purports to prohibit, and therefore fails to meet the requirements of the due process. *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966) (finding unconstitutionally vague a Pennsylvania statute requiring an acquitted criminal defendant to pay the costs of his prosecution if the jury determined he was guilty of "some misconduct" less than that necessary for a conviction for the offense charged).

In the instant case, the reference to Russian law in the Indictment placed this Court in the difficult position of both ascertaining the meaning of a provision of the Russian Criminal Code and charging the jury in accordance with the provision in a manner that was both legally correct and consistent with due process. Upon review, this Court finds, although the jury charge on the meaning of Article 133 was consistent with Butler's expert testimony, and was a correct statement of Russian law, this law does not comply with the requirements of the due process clause because it is too vague. As Butler testified, the statute allows for a conviction under Article 133 based on a finding the person compelled to engage in sexual intercourse was not materially dependent on the defendant, but was "otherwise dependent."

It is unclear whether such "other dependence" must be objective or subjective, whether it must be reasonable for the person to feel such dependence, or whether an unreasonable dependence upon another may suffice. There is no indication whether "other dependence" must be fostered by the defendant or if it could arise through no effort on the defendant's part. The statute also does not specify the extent of such dependence or the import such dependence must have on the victim's livelihood and well-being. A law is void for vagueness "if it leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case."

*Giaccio*, 382 U.S. at 403. This is the precise problem with the disputed instruction in this case. Based on Butler's testimony, this Court instructed the jurors they could use their discretion to decide whether a person was otherwise dependent, because the Russian Criminal Code did not define the term. This is similar to the Pennsylvania law found unconstitutional in *Giaccio*, which "contain[ed] no standards at all." 382 U.S. at 402. Here, the Russian statute provided no guidance by which the jury could evaluate "other dependence." As translated, this statute does not "give adequate warning of the boundary between the permissible and the impermissible applications of the law." *City of Chi. v. Morales*, 527 U.S. 41, 59 (1998) (holding a Chicago ordinance prohibiting "loitering" by two or more people, one of whom was a gang member, which defined loitering as "to remain in any one place with no apparent purpose," was too vague to be constitutional because an average citizen would have no way of determining whether she had an "apparent purpose" and the ordinance provided too much enforcement discretion to the police). Accordingly, this law is too vague to satisfy American standards of due process and Schneider's conviction on Count II is reversed on this alternative basis as well.[17]

Schneider next argues § 2421 is unconstitutional as applied because it is based on a violation of a foreign country's law "that was not and would not be prosecuted in [America] and is based on a stretched interpretation or application of the foreign statute." Def.'s Mem. 11. Schneider contends the language of § 2421 does not suggest that, by penalizing transporting a person "with intent that such person engage in prostitution, or in any sexual offense for which any person can be charged

_____

[17] That Schneider was charged with transporting Zavarov with intent to violate Article 133, rather than an actual violation of Article 133, does not affect the vagueness analysis. The same concerns of fair notice apply to a charge of intent to violate the law, and it similarly offends notions of justice to sustain a conviction for intending to commit an act prohibited in a statute containing language too broad and vague to enable a person of ordinary intelligence to conform his behavior to the law.

with a criminal offense . . . ," Congress intended to include criminal offenses which arise under foreign laws.[18]  Schneider further argues such an interpretation of Congressional intent would be absurd, and potentially unconstitutional, insofar as many other countries outlaw sexual conduct which is legal in the United States, including non-marital sexual activity and sexual activity between two people of the same sex.

The Government asserts, in enacting § 2421, Congress intended to include a violation of the law in a foreign jurisdiction, noting the language of the statute does not limit prosecution to those crimes where a person transports another with the intent to engage in an act which would be a crime in the United States.  The Government further asserts it is inconsistent with Congressional intent to construe the statute to mean a defendant who takes a victim to another country to sexually abuse him could only be prosecuted for a violation of the other country's laws if there was an identical American state or federal law criminalizing the same conduct.

While the Third Circuit has held "no due process violation occurs when Congress criminalizes conduct abroad that is 'condemned universally by law-abiding nations,'" *Pendleton*, 2011 U.S. App. LEXIS 18565, at *3, n.2 (summarizing the holding in *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993)), the Supreme Court recently held an American's prior felony conviction in Japan could not serve as the predicate offense for a prosecution under the felon-in-possession statute, even though the statute forbids possession of a gun by any person "who has

---

[18] Schneider argues the absence of specific intent is clear when this statute is compared to the Lacey Act, 16 U.S.C. § 3372, in which Congress explicitly prohibited conduct that would constitute a violation of "any State, or any foreign law" related to the importation of fish, wildlife, or plants.  *See United States v. McNab*, 331 F.3d 1228 (11th Cir. 2003) (upholding conviction for importing lobster parts in violation of Honduran fishing regulations); *see also* 18 U.S.C. § 846 (prohibiting smuggling in foreign nations in violation of that nation's laws, provided the nation reciprocally enforces American smuggling laws within its borders).

been convicted in any court," because inclusion of a defendant's foreign conviction record "may include a conviction for conduct that domestic laws would permit." *Small v. United States*, 544 U.S. 385, 389 (2005). *But see McNab*, 331 F.3d at 1239 (upholding Lacey Act conviction of a defendant who transported lobster parts packaged in violation of Honduran fishing regulations, holding regulations promulgated by foreign governments to protect wildlife are encompassed by the phrase "any foreign law" in the Lacey Act); *United States v. Lee*, 937 F.2d 1388, 1393 (9th Cir. 1991) (upholding Lacey Act conviction for violation of Taiwanese fishing regulations and stating "the Act does not impermissibly delegate any legislative power to foreign governments" nor does it "'call for the assimilation of foreign law into federal law'" (citation omitted)). This Court, however, need not determine whether § 2421 is unconstitutional to the extent it incorporates the law of a foreign country which criminalizes actions that are not prohibited here because this Court will reverse Schneider's § 2421 conviction under *Mortenson*, pursuant to his as-applied constitutional challenge, and for insufficiency of the evidence.

Finally, Schneider seeks a new trial, arguing he was unduly prejudiced in violation of Federal Rule of Evidence 403 by the introduction of prior bad acts evidence, including the Government's introduction of evidence regarding Schneider's possession of ceramic faun figurines and airing of excerpts of the film *Nijinsky*. When the faun figurines were introduced at trial, this Court asked Schneider's counsel whether he had any objection to their introduction and counsel did not. Therefore, by failing to object, Schneider waived his objection to the introduction of the figurines. *See Am. Home Ins. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 324 (3d Cir. 1985) (explaining Federal Rule of Evidence 103(a) requires a timely objection to be made in order to preserve an evidentiary issue for appeal). Moreover, even if Schneider had objected, introduction of the figurines

into evidence does not require a new trial because the figurines were not unduly prejudicial.

Evidence is unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise may cause a jury to base its decision on something other than the established propositions in the case." *United State*s *v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986) (internal quotation marks and citation omitted). To determine whether evidence is unduly prejudicial, this Court must consider:

> [1] the tendency of the alleged conduct to lead to a decision on an improper basis; [2] the nature or style of the witness's testimony; [3] the probability that the testimony is true; [4] the sufficiency of the other evidence submitted to reasonably tie the defendant to the crime alleged[;] and [5] whether the evidence inflames the jury.

*United States v. Crawford*, 379 F. App'x 185, 189 (3d Cir. Apr. 15, 2010) (citing *Guerrero*, 803 F.2d at 786). The Government argued the figurines were connected to Schneider's attempt to psychologically manipulate Zavarov by comparing their relationship to the relationship of Nijinsky and Diaghilev. One of Nijinsky's famous dance roles was as a faun in the ballet The Afternoon of a Faun (or *L'après-midi d'un faune*), and the Government introduced the figurines in support of its argument Schneider collected the ceramic figures as part of a continuing scheme to suggest to Zavarov his ballet future was inseparable from his romantic relationship with Schneider. Although this theory was bizarre, introduction of the figurines did not tend to lead the jury to a decision on an improper basis and was significantly undercut by defense testimony that the fauns were valuable collectible items which Schneider purchased for his mother so she could sell them in her antique shop. Moreover, although this evidence was odd and potentially confusing to the jury, it did not inflame the jury by appealing to its sympathies or sense of horror. Finally, as discussed below, the remaining evidence was sufficient to show Schneider sexually abused Zavarov so as to make

admission of the faun figurines harmless.

Schneider's challenge to evidence regarding the *Nijinsky* film is two-fold. He first argues any evidence he showed the film to Zavarov was improper prior bad acts evidence introduced in violation of Federal Rule of Evidence 404(b). Rule 404(b) provides evidence of "other crimes, wrongs, or acts" is not admissible "to prove the character of a person in order to show action in conformity therewith." Such evidence, however, may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *Id.* Schneider argues evidence he showed *Nijinsky* to Zavarov could constitute the crime of corrupting the morals of a minor[19] and suggest to the jury that Schneider has the propensity to commit crimes involving children. *See United States v. Sampson*, 980 F.2d 883, 887 (3d Cir. 1992) (stating the government "must clearly articulate how [other bad acts] evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed [similar] offenses before, he therefore is more likely to have committed this one"). The Government contends the film was "intrinsic to the charged offenses" insofar as the film shows Schneider's "psychosexual entanglement with the child victim," and his intent when he traveled with Zavarov in 2001. Gov't's Resp. 16. Here, testimony about the film *Nijinsky* was introduced for a proper purpose. The Government has shown a chain of logical inferences between this film and Schneider's offense; because Schneider showed Zavarov the film and warned Zavarov not to leave him the way Nijinsky left his older patron lover, Diaghilev, it was more likely Schneider intended to have a sexual relationship with Zavarov, and this evidence revealed his motive and intent, proper exceptions to Rule 404(b).

---

[19] *See* 18 Pa. C.S. § 6301 ("[W]hoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, . . . commits a misdemeanor of the first degree.").

Schneider next argues, even if testimony regarding *Nijinsky* did not violate Rule 404(b), the Government violated Rule 403 by showing excerpts of the film to the jury, including scenes which depicted two men kissing and showed a young man simulating masturbation. This Court agrees excerpts of the film were unduly prejudicial inasmuch as they included sexual content unrelated to the charges in this case. However, although this evidence was unduly prejudicial and not particularly probative, introduction of this evidence was harmless because it does "not appear the evidence had a substantial impact on the jury's verdict." *United States v. Ali*, 493 F.3d 387, 392-93 n.3 (3d Cir. 2007). The film was introduced pursuant to the Government's theory showing Zavarov the film revealed Schneider's intent to engage in sexual acts with Zavarov. However, if these excerpts from the film had not been played for the jury, it would not have affected the jury's verdict because the evidence Schneider had engaged in sexual acts with Zavarov–and intended to do so again at the time of his travel on August 22, 2001–was overwhelming.

Zavarov testified Schneider performed oral sex on him and directed Zavarov to perform oral sex on Schneider, and eventually had anal sex with Zavarov at least three times per week. Although Zavarov's parents did not know about these sexual encounters, his parents testified that after Zavarov began living with Schneider, his demeanor changed and he became sullen and withdrawn. Zavarov explained how Schneider grew close to him and became like a second father, telling Zavarov he hoped they would be together for "trillion thirteen years" and warning Zavarov not to leave him or his ballet career would end. Zavarov's wife, D'Amico, testified that, years later, Zavarov still has issues with intimacy and struggles with depression because of Schneider's prior sexual assaults. Defense witness Christina Bates, who served as Zavarov's therapist, testified when he came to see her he felt angry, hostile, anxious, and depressed, and reported issues related to his childhood.

Zavarov also told Bates he became agitated and upset when people approached him or hugged him from behind. Another defense witness, Simon Gronic, a 14-year-old boy from Moldova, testified that although Schneider never had oral or anal sex with him, Schneider also sponsored his arts education, traveled with him to the United States, and touched him in ways that made him feel uncomfortable.

In light of this overwhelming evidence showing Schneider sexually assaulted Zavarov, and traveled with the intent to continue engaging in such assaults, the Government's introduction at trial of excerpts of *Nijinsky* was harmless error. Accordingly, Schneider's motion for a new trial is denied.

For the foregoing reasons, this Court will enter a judgment of acquittal on Count II of the Indictment, and will otherwise affirm the jury's verdict. An appropriate order follows.